2005 SD 71

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Henry L. MATTSON, III, Defendant and Appellant.**

**No. 23257.**

Supreme Court of South Dakota.

Argued Feb. 16, 2005.

Decided June 8, 2005.

Lawrence E. Long, Attorney General, Frank E. Geaghan, Assistant Attorney General, Pierre, South Dakota, for plaintiff and appellee.

Jeremiah J. Davis, Pennington County Public Defender's Office, Rapid City, South Dakota, for defendant and appellant.

GILBERTSON, Chief Justice.

[¶ 1.] Defendant, while riding as a passenger, was arrested along with the driver of the vehicle and several passengers after a drug dog sniff conducted at a routine traffic stop revealed the presence of drugs. Defendant was convicted of possession of methamphetamine. On appeal, Defendant contends the trial court erred when it allowed the State to introduce as other acts evidence, statements made by and a urine sample given by Defendant to law enforcement three months prior to his arrest for the events of September 7, 2003. Defendant alleges the drug dog sniff conducted on the vehicle in which he was a passenger was a violation of his Fourth Amendment rights. Defendant also contends the trial court erred when it allowed the State to introduce evidence at trial that Defendant refused to give a urine sample for drug testing purposes after his arrest on the possession charge.

[¶ 2.] We Affirm.

## FACTS AND PROCEDURE

[¶ 3.] On September 7, 2003, Trooper Ryan Mechaley of the South Dakota Highway Patrol noted a vehicle traveling on Elk Vale Road, east of Rapid City, South Dakota, well in excess of the posted speed limit of fifty-five miles per hour. After activating his radar unit, Trooper Mechaley clocked the black Jeep Cherokee at eighty-six miles per hour. In addition to the driver Michael Neumiller (Neumiller), the vehicle had four occupants. Benjamin Inich was seated in the front passenger seat. Behind Inich in the backseat sat Shawn Mercy, and to his left in the middle of the rear passenger seat was Misty Koch. The Defendant, Henry Mattson, was seated in the rear passenger seat directly behind the driver.

[¶ 4.] Trooper Mechaley stopped the vehicle at 5:56 p.m. He asked the driver, Neumiller, to produce his driver's license, registration and proof of insurance and to accompany him to the patrol car. While reviewing Neumiller's driver's license, Trooper Mechaley thought he recognized Neumiller's name in connection with methamphetamine activity in Rapid City. Trooper Mechaley asked the driver if any of the passengers in the vehicle used illegal substance, and was told by Neumiller "I think so." At 6:00 p.m., Trooper Mechaley initiated a radio request for a driver's license check, a criminal history check on Neumiller, and a canine unit.

[¶ 5.] Trooper Oxner, a canine handler with the South Dakota Highway Patrol, was within three to four miles of Trooper Mechaley's location and arrived on the scene at 6:03 p.m. Upon arrival, Trooper Oxner engaged Neumiller in conversation, and told Neumiller how the dog would react if it detected the presence of drugs. Trooper Oxner then asked the occupants of the black Jeep Cherokee to exit the vehicle prior to beginning the drug dog

sniff. Trooper Mechaley concluded writing the traffic ticket, but had yet to receive the results of Neumiller's license check and criminal history check when he exited his patrol car and asked for consent to search the occupants of the vehicle. The driver and several occupants consented to be searched. While both troopers were outside the patrol cars and engaged in their respective search activities, the results of Neumiller's driver's license check were radioed back to Trooper Mechaley.

[¶ 6.] Trooper Oxner directed his canine dog, Keya, to begin the sniff on the passenger side of the vehicle, beginning at the right rear quarter panel and running in a counterclockwise direction. Keya alerted by standing on her hind legs, and repeatedly pawing at the front passenger side door. Trooper Oxner concluded the drug dog sniff once Keya alerted, and both troopers engaged in searching the vehicle. A few seconds after Keya indicated the presence of drugs, a radio transmission was received by Trooper Mechaley with the results of Neumiller's criminal history check.

[¶ 7.] Four empty syringes were found on the floor of the vehicle underneath the back seat. One was located where the Defendant had been seated, another to passenger Koch's right, and the third immediately below and to the left of where passenger Mercy had been seated. The fourth empty syringe was located inside the vehicle, but the exact location was not reflected in the record. A fifth syringe was located in the side panel of the driver's door, and was approximately one-fourth full of a clear liquid substance later determined to be methamphetamine. The officers also recovered a small black case that contained a baggie of crystal methamphetamine, and a scale with methamphetamine residue on it. The black case was found partially tucked between the seat and backrest cushions of the back seat, and was located between where Koch and Mercy had been seated.

[¶ 8.] The items discovered in the vehicle had no "indicia of ownership," and could not be linked to a specific occupant. Trooper Oxner confronted the occupants about the drugs that had been found. All the occupants denied ownership. Trooper Oxner informed the five individuals that all of them would be arrested and taken to jail where they would have to submit to a urinalysis. Trooper Oxner informed the occupants that "if the UA's come back with the methamphetamine, it is going to show that they are using." Defendant replied that nothing would show up in his UA except possibly marijuana.

[¶ 9.] In an effort to determine which of the occupants might have recently used a syringe, each occupant was asked to show their arms to the troopers for the purpose of locating track marks or needle marks. Each occupant voluntarily complied with the request. Trooper Mechaley noted what he believed to be fresh track marks on one of the Defendant's arms, as did Trooper Oxner. Trooper Oxner, who had received special training in detecting and identifying drug usage, testified that he "noticed immediately Mr. Mattson had a large, raised, dark purple or bruised track mark on his left arm," "right on the main vein in the elbow." When asked about the marks on his arm, Defendant stated the marks were the result of a spider bite. Trooper Oxner also noticed older track marks on Defendant's right arm. Defendant repeatedly stated he had not used methamphetamine for some time and that his urine would come back negative for methamphetamine. Based on these observations and the drugs seized in the vehicle, Defendant was arrested along with three of the other four occupants of the vehicle. After his arrest, Defendant

refused to provide officers with a urine sample.

[¶ 10.] Defendant was charged with the unauthorized possession of a controlled substance under SDCL 22–42–5, and entered a plea of not guilty. On March 16, 2004, a jury trial was held. At the jury trial, the State was allowed to present evidence of Defendant's prior drug use over the objections of defense counsel. Rapid City police officer Keith White testified that on May 21, 2003, almost four months prior to the traffic stop, Defendant informed the officer that he had used methamphetamine the day before and that he used methamphetamine once a week or less. Defendant also stated he was trying to stay away from people who used methamphetamine. Lastly, Defendant gave Neumiller's name as a person from whom he had previously purchased methamphetamine. The results of a urine sample collected from Defendant on May 22, 2003, indicating the presence of methamphetamine in Defendant's system, were also entered into evidence at trial.

[¶ 11.] The State offered a jury instruction modeled after the pattern jury instruction for a Driving While Intoxicated suspect who refuses to supply a blood sample for chemical analysis. Defendant objected to the instruction, and was overruled.

[¶ 12.] Defendant was convicted of the charge, and sentenced as a habitual offender to five years in the state penitentiary. Defendant filed this appeal raising the following issues:

1. Whether it was an abuse of the trial court's discretion when it allowed the State to introduce evidence of Defendant's prior use of an illegal drug to establish knowledge, intent and absence of mistake.

2. Whether a Fourth Amendment violation occurs when a vehicle is val-

idly detained for the purpose of issuing a traffic citation, an offsite canine unit is called to the scene, arrives prior to the conclusion of the traffic stop, and initiates but does not conclude the drug dog sniff prior to the conclusion of the traffic stop.

3. Whether the trial court erred when it allowed the State to establish at trial that Defendant refused to provide a urine sample for a drug test following his arrest for possession of a controlled substance.

## STANDARD OF REVIEW

[¶ 13.] We presume the evidentiary rulings made by a trial court are correct, and review those rulings under an abuse of discretion standard. *State v. Goodroad*, 1997 SD 46, ¶ 9, 563 N.W.2d 126, 129 (citing *State v. Oster*, 495 N.W.2d 305, 309 (S.D.1993)). The test for abuse of discretion "is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Id.* (citing *State v. Rufener*, 392 N.W.2d 424, 426 (S.D.1986)). If error is found, it must be prejudicial in nature before this Court will overturn the trial courts evidentiary ruling. *Novak v. McEldowney*, 2002 SD 162, ¶ 7, 655 N.W.2d 909, 912 (citing *State v. Smith*, 1999 SD 83, ¶ 39, 599 N.W.2d 344, 353) (citation omitted). "Error is prejudicial when, in all probability … it produced some effect upon the final result and affected rights of the party assigning it." *Id.* (citing *Smith*, 1999 SD 83, ¶ 39, 599 N.W.2d at 353) (quoting *K & E Land and Cattle, Inc. v. Mayer*, 330 N.W.2d 529, 533 (S.D.1983)).

[14.] A motion to suppress based on an alleged violation of a constitutional

right is reviewed under the de novo standard. *State v. De La Rosa*, 2003 SD 18, ¶ 5, 657 N.W.2d 683, 685 (citing *State v. Rechtenbach*, 2002 SD 96, ¶ 6, 650 N.W.2d 290, 292) (citing *State v. Hodges*, 2001 SD 93, ¶ 8, 631 N.W.2d 206, 209)). A trial courts findings of fact are reviewed under the clearly erroneous standard. *Id.* (citing *Hodges*, 2001 SD 93, ¶ 8, 631 N.W.2d at 209). "Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *Id.* (quoting *State v. Hirning*, 1999 SD 53, ¶ 8, 592 N.W.2d 600, 603) (citing *Spenner v. City of Sioux Falls*, 1998 SD 56, ¶ 13, 580 N.W.2d 606, 610).

## ANALYSIS AND DECISION

[¶ 15.] **1. Whether it was an abuse of the trial court's discretion when it allowed the State to introduce evidence of Defendant's prior use of an illegal drug to establish knowledge, intent and absence of mistake.**

[¶ 16.] The State notified Defendant of its intent to introduce other acts evidence at trial, including the testimony of Rapid City police officer Keith White concerning a May 21, 2003, traffic stop, and Defendant's statements about his methamphetamine use, using Neumiller as one of his suppliers, and the results of a positive urinalysis conducted on May 22, 2003. Defendant argued at a motion hearing on February 12, 2004, that the testimony was not relevant to the current charge, and was more prejudicial than probative. The trial court denied Defendant's motion. Defendant objected to the testimony at trial, properly preserving the issue for appeal. On appeal, Defendant urges this Court to recognize that the other acts testimony was relevant only for the improper purpose of proving prior drug use and conformity therewith on the occasion of September 7, 2003.

[¶ 17.] We have previously held that when a defendant denies knowledge and intent when facing a charge in which those elements must be established by the State, knowledge and intent may be shown through the use of other acts evidence. *State v. McDonald*, 500 N.W.2d 243, 246 (S.D.1993) (holding defendants prior cocaine use relevant to show knowledge and absence of mistake when defendant, charged with knowing possession of cocaine, claimed she did not know the folded paper packet found in her handbag contained cocaine) (citing *State v. Werner*, 482 N.W.2d 286, 290 (S.D.1992) (quoting *United States v. Estabrook*, 774 F.2d 284, 289 (8th Cir.1985))). The admission of other acts evidence is permitted under SDCL 19–12–5 (FRE 404(b)), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

SDCL 19–12–5 is a rule of inclusion. *State v. Christensen*, 2003 SD 64, ¶ 27, 663 N.W.2d 691, 698 (citing *State v. Wright*, 1999 SD 50, ¶ 13, 593 N.W.2d 792, 798).

[¶ 18.] A two-part test is used to determine whether other acts evidence is admissible at trial: "(1) Whether the intended purpose for offering the other acts evidence is relevant to some material issue in the case (factual), and (2) Whether the probative value of the evidence is substantially outweighed by its prejudicial effect (... [legal] relevancy)." *State v. Anderson*, 2000 SD 45, ¶ 92, 608 N.W.2d 644, 669 (citation omitted).

[¶ 19.] The factual relevance of evidence is determined under SDCL 19–12–1 (FRE 401), which provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

"Relevancy is demonstrated where evidence is necessary to prove an element of the crime, not simply to demonstrate defendants character." *State v. Lassiter*, 2005 SD 8, ¶ 14, n.2, 692 N.W.2d 171, 176 (citing *State v. Red Star*, 2001 SD 54, ¶ 11, 625 N.W.2d 573, 577). "Where it is made clear at the outset of the trial that the defendants principal defense is lack of knowledge or intent, and thus the issue is unarguably in dispute, the government may introduce the other act evidence." *McDonald*, 500 N.W.2d at 246 (citing *Werner*, 482 N.W.2d at 290 (quoting *Estabrook*, 774 F.2d at 289)). "The admission of other acts evidence to prove knowledge is premised on the hypothesis that it is unlikely that repetitive involvement in criminal conduct will leave a defendant oblivious to the character of the acts in question." *Id.* (quoting *Estabrook*, 774 F.2d at 288 (citing 2 J. Weinstein & M. Berger, Weinsteins Evidence § 404(13) at 404–72 (1982))).

[¶ 20.] An additional safeguard on the admission of other acts evidence is imposed by SDCL 19–12–3 (FRE 403).[1] If other acts evidence is relevant and offered for a purpose other than to prove character and conformity with that character, it still may be excluded if the probative value of the evidence is substantially outweighed by factors such as unfair prejudice. *Novak*, 2002 SD 162, ¶ 11, 655 N.W.2d at 913. Evidence will be prejudicial if it persuades the jury in an unfair or illegitimate manner, but not merely because it harms the other party's case. *Id.* (citing *State v. Steichen*, 1998 SD 126, ¶ 27, 588 N.W.2d 870, 876). "The party objecting to the admission of evidence has the burden of establishing that the trial concerns expressed in Rule 403 substantially outweigh probative value." *Wright*, 1999 SD 50, ¶ 16, 593 N.W.2d at 799 (quoting John W. Larson, South Dakota Evidence § 403.1 (1998 Cumulative Supplement)).

[¶ 21.] "A trial court's determination to admit other acts evidence will not be overruled absent an abuse of discretion." *Anderson*, 2000 SD 45, ¶ 93, 608 N.W.2d at 670 (citing *State v. Larson*, 512 N.W.2d 732, 736 (S.D.1994)); *McDonald*, 500 N.W.2d at 245; *Werner*, 482 N.W.2d at 288. "Upon review . . . we must be careful not to substitute our reasoning for that of the trial court." *Id.* (citing *Larson*, 512 N.W.2d at 736). On review the question is not whether we would have admitted the prior bad acts evidence if we had been trial judges. *Id.* Instead, we must ask whether the trial court in the case below abused its discretion by admitting the prior bad acts evidence. *Id.* (citing *Larson*, 512 N.W.2d at 736; *Rufener*, 392 N.W.2d at 426). Therefore, if the prior bad acts evidence was introduced for any proper purpose, its use is sustainable on appeal. *Wright*, 1999 SD 50, ¶ 17, 593 N.W.2d at 800 (citing SDCL 19–9–12).

[¶ 22.]Defendant was charged with the unauthorized possession of a controlled substance under SDCL 22–42–5, which provides:

No person may *knowingly* possess a controlled drug or substance unless the substance was obtained directly or pur-

---

1. SDCL 19–12–3 (FRE 403) provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

suant to a valid prescription or order from a practitioner, while acting in the course of the practitioner's professional practice or except as otherwise authorized by chapter 34–20B. A violation of this section is a Class 4 felony.

(emphasis added). "Possession requires that an individual be aware of the presence and character of the drug and intentionally and consciously possess such drug." *State v. Hanson*, 1999 SD 9, ¶ 16, 588 N.W.2d 885, 890 (citing *State v. Wellner*, 318 N.W.2d 324, 332 (S.D.1982) (citing *State v. Kietzke*, 85 S.D. 502, 506, 186 N.W.2d 551, 554 (1971))). However, possession may be shared with others. *Id.* (quoting *Kietzke*, 85 S.D. at 506, 186 N.W.2d at 554). The State, therefore, was required to prove the elements of knowledge and intent on the part of Defendant as to the presence of drugs in the vehicle.

[¶ 23.] In the instant case, the trial court conducted the required balancing test on the record during a motion hearing on February 12, 2004. At that hearing, the trial court noted the limited exceptions for which the prior acts evidence would be admitted, specifically to show knowledge, intent and absence of mistake. The record indicates the trial court determined that the State had the burden to show knowledge, intent, and absence of mistake "in light of the fact that statements have been made that the track mark found on the defendant's arm was caused [by] a spider bite, that he knew nothing of the goings on of the other persons in the car." The trial court then determined the probative value of the prior acts was not substantially outweighed by the danger of unfair prejudice.

[¶ 24.] Defendant's trial strategy was to deny knowledge of a drug deal conducted earlier in the day by Neumiller, deny knowledge of the presence of methamphetamine in the vehicle, and deny knowledge of the drug-related conduct in the vehicle

while Defendant was present. Defense counsel's trial strategy was to show that Defendant was merely a passenger in the vehicle, and that there was no knowing possession on the part of the Defendant. In opening statements defense counsel stated: "there will be no testimony that he knew there was the presence of drugs in that vehicle that evening or that he knew there was a loaded syringe or other syringes found in the vehicle that day." Therefore, the State could introduce prior act evidence to show Defendant's past use was sufficient for him to be familiar with and understand that methamphetamine was present in the vehicle.

[¶ 25.] Defendant also denied having fresh track marks on his arm, instead offering the explanation that the marks were caused by a spider bite. Therefore, whether Defendant's arm wounds were spider bites or track marks remained open to inference. Defendant did not testify and defense counsel tried to cast doubt on the source of the wounds by questioning Officer Oxner and his experience with spider bites. The State introduced Defendant's past methamphetamine use to show Defendant knew track marks result from intravenous methamphetamine use in order to show absence of mistake that the marks were track marks and not spider bites.

[¶ 26.] At trial, Defense counsel admitted to Defendant's prior drug problem in opening statements, and conducted extensive voir dire during the jury selection process to determine if the panel members would be unduly influenced by Defendant's prior drug history. The State introduced testimony from the other occupants of the vehicle as to the time Defendant entered the vehicle, details on the methamphetamine purchase conducted earlier by some of the occupants of the vehicle, evidence as to the presence of methamphetamine and

syringes in the vehicle, and the other acts evidence from the events of May 21 and 22, 2003. Finally, the trial court charged the jury with an instruction that limited the use the jury could make of the other acts evidence "for the limited purpose of determining if it tends to show: the defendant had knowledge of things found in his possession, the intent to possess, or the absence of mistake or accident."

[¶ 27.] The State did not introduce the other acts evidence solely for the purpose of demonstrating character and conformity therewith. Rather, the State used the other acts evidence for a proper purpose, to show Defendant's knowledge of the presence of drugs in the vehicle, his intent, and absence of mistake. The trial court did not abuse its discretion in admitting the other acts evidence for these limited purposes.

[¶ 28.] **2. Whether a Fourth Amendment violation occurs when a vehicle is validly detained for the purpose of issuing a traffic citation, an offsite canine unit is called to the scene, arrives prior to the conclusion of the traffic stop, and initiates but does not conclude the drug dog sniff prior to the conclusion of the traffic stop.**

[¶ 29.] The text of the Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

US Const. amend. IV. This prohibition against unreasonable searches requires generally the issuance of a warrant by a neutral judicial officer based on probable cause prior to the execution of a search or seizure of a person. *De La Rosa*, 2003 SD 18, ¶ 7, 657 N.W.2d at 685 (citing *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968)). However, courts recognize exceptions to this general rule, including allowing an officer to conduct a traffic stop when the officer personally observes a traffic violation. *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 646 (8thCir.1999) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331, 336 (1977); *United States v. Barahona*, 990 F.2d 412, 416 (8thCir.1993)).

[¶ 30.] The State has the burden of proving that a warrantless search falls into a specific exception to the warrant requirement. *State v. Hess*, 2004 SD 60, ¶ 23, 680 N.W.2d 314, 324.

While the stop may not be the product of mere whim, caprice or idle curiosity, it is enough that the stop is based upon "specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant the intrusion." *State v. Herrboldt*, 1999 SD 55, ¶ 7, 593 N.W.2d 805, 808 (quoting *Spenner v. City of Sioux Falls*, 1998 SD 56, ¶ 14, 580 N.W.2d 606, 611). Under these standards, *it is well established that a traffic violation, however minor, creates sufficient cause to stop the driver of a vehicle.*" *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95-[96] (1996); *State v. Kenyon*, 2002 SD 111, ¶ 16, 651 N.W.2d 269, 274.

*State v. Akuba*, 2004 SD 94, ¶ 15, 686 N.W.2d 406, 413 (quoting *State v. Chavez*, 2003 SD 93, ¶ 16, 668 N.W.2d 89, 95). There is no question that the officer had an objective basis for the stop of Neumiller's vehicle, as it was traveling at the speed of eighty-six miles per hour in a fifty-five miler per hour zone. The only

remaining issue is whether, under the facts of this case, the drug dog sniff was within constitutionally permissible limits.

[¶ 31.] The United States Supreme Court recently ruled that the Fourth Amendment does not require reasonable, articulable suspicion to justify using a drug dog sniff that "does not expose noncontraband items that otherwise would remain hidden from public view," during a legitimate traffic stop. *Illinois v. Caballes,* — U.S. —, —, 125 S.Ct. 834, 838, 160 L.Ed.2d 842 (2005) (quoting *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110, 121 (1983)). That Court noted that a drug dog sniff ordinarily does not reveal information other than the location of contraband, and therefore does not infringe upon a motorist's constitutionally protected interest in privacy. *Id.* In that case, the defendant conceded the drug dog sniff was conducted while he was lawfully seized for a traffic violation. *Id.* The Supreme Court noted that conducting a drug dog sniff during a lawful traffic stop does not alter "the character of a traffic stop when the stop is lawful at its inception and otherwise executed in a reasonable manner[.]" *Id.* Therefore, Defendant's contention that Trooper Mechaley needed reasonable, articulable suspicion to justify using a drug dog sniff is without merit.

[¶ 32.] Defendant next argues the duration of the traffic stop was impermissibly extended to allow the canine unit to arrive on the scene. The issue of whether the duration of the traffic stop was improperly extended to enable the dog sniff to occur was not at issue in *Caballes. Id.* at —, 125 S.Ct. at 837.[2] Therefore, *State v. De La Rosa* continues to control. 2003 SD 18, 657 N.W.2d 683. In that case, the driver, De La Rosa, was legitimately stopped for a routine traffic violation for failure to use his left turn signal. *Id.* ¶ 2, 657 N.W.2d at 684–85. The officer conducted a radio check for warrants and a driver's license check that came back clear, and then issued a warning citation for the signal violation. *Id.* The officer did not indicate to De La Rosa that he would be free to leave once the traffic ticket was issued. *Id.* ¶ 3, 657 N.W.2d at 685. Instead the officer asked De La Rosa to stand in front of the patrol car while he used his drug dog to sniff the vehicle. *Id.* The officer had the drug dog at his immediate disposal in his vehicle, and as the Defendant in that case conceded, the sniffing activity was of a short duration. *Id.* ¶ 11, 657 N.W.2d at 687.

[¶ 33.] In the instant case, the canine unit arrived while Trooper Mechaley was still in the process of writing the ticket. A careful review of the videotape reveals that Trooper Oxner began preparing the Neumiller vehicle for the drug dog sniff by asking the occupants of the vehicle to exit and stand by the side of the road. Once Trooper Mechaley finished writing the ticket, but before his request for a driver's license check and criminal history check of the driver had been completed, Trooper Mechaley exited his vehicle and began to assist Trooper Oxner with the passengers.

---

2. The facts of *Caballes* are identical to the facts in the present case, as the drug dog arrived with its handler after the traffic stop was commenced by another officer. *People v. Caballes,* 207 Ill.2d 504, 280 Ill.Dec. 277, 802 N.E.2d 202, 203 (2003) *vacated and remanded by Illinois v. Caballes,* — U.S. —, 125 S.Ct. 834, 160 L.Ed.2d 842. However, the United States Supreme Court did not consider these facts and whether the traffic stop was impermissibly extended to allow the drug dog sniff to occur. *Caballes,* — U.S. at —, 125 S.Ct. at 837. Instead the Court based its holding on the narrower issue of "Whether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." *Id.*

After Trooper Mechaley began assisting Trooper Oxner with the passengers, Trooper Mechaley's radio can be heard transmitting the results of Neumiller's driver's license check, but not the criminal history check. At that point, all that remained to be done was for Trooper Oxner to remove his dog Keya from the patrol car and run the dog around the Neumiller vehicle. Neither officer gave the driver or the occupants any indication that the traffic stop would conclude prior to running the dog around the Neumiller vehicle. A few seconds after Keya indicated the presence of drugs, Trooper Mechaley's radio can be heard transmitting the results of Neumiller's criminal history check.

[¶ 34.] The facts of this case are almost identical to the facts in *De La Rosa*, except that Trooper Oxner and his dog Keya arrived on the scene after the traffic stop had begun, but before completion of the ticket. Similarly, no announcement had been made to the driver or the passengers that the traffic stop was completed prior to Oxner's arrival with Keya. We reaffirm our holding in *De La Rosa*, that a few seconds delay for a non-entry sniffing of the exterior of a vehicle by a drug dog *already on the scene* is constitutionally reasonable. Under the facts of this case, Trooper Oxner's arrival with the drug dog after the start of the traffic stop, but before it was concluded, did not impermissibly extend the stop beyond the time necessary to complete the citation form and receive the radio communications for the driver's license and criminal history checks.

[¶ 35.] Therefore, we hold the trial court did not err when it denied Defendants motion to suppress the evidence discovered as a result of the drug dog sniff.

[¶ 36.] **3. Whether the trial court erred when it allowed the State to establish at trial that Defendant refused to provide a urine sample for a drug test following his arrest for possession of a controlled substance.**

[¶ 37.] Defendant contends on appeal that the trial court erred when it allowed the State to introduce evidence that Defendant refused to provide a urine sample following his arrest. Defendant argues his Fifth Amendment right against self-incrimination was prejudiced because he was unaware he did not have a Fourth Amendment right to refuse to take the urinalysis.[3] Because Defendant was not in a position to know whether or not his refusal could be used against him at the time of the request, Defendant argues he was prejudiced by his mistaken belief. Defendant also takes issue with the jury instruction used by the trial court. Defendant argues that the jury instruction was impermissible because there is no affirmative duty to provide a urine sample at the request of a police officer.

**A) Admissibility of Defendant's refusal to take a urinalysis**

[¶ 38.] There is no Fifth Amendment right to refuse to provide non-testimonial, physical evidence for tests such as fingerprints, writing samples, breath samples, and blood-alcohol tests. *South Dakota v. Neville*, 459 U.S. 553, 564, 103 S.Ct. 916, 923, 74 L.Ed.2d 748, 759 (1983) (holding no Fifth Amendment right to refuse to provide sample for blood-alcohol test when probable cause exists to believe defendant was driving under the influence); *Schmerber v. California*, 384

---

**3.** Defendant does not contend on appeal that he had a Fourth Amendment right to refuse to provide a urine sample.

U.S. 757, 762–65, 86 S.Ct. 1826, 1831–33, 16 L.Ed.2d 908, 915–17 (1966) (holding there is no Fifth Amendment privilege against self-incrimination when the State seeks to obtain physical evidence from a suspect that does not involve testimonial compulsion or forced communication); *State v. Hoenscheid,* 374 N.W.2d 128, 130 (S.D.1985) (holding no Fifth Amendment right to refuse to perform field sobriety tests when probable cause exists to believe defendant was driving under the influence). A defendant's refusal to perform such non-testimonial tests is admissible at trial, as the refusal is equally non-communicative and non-testimonial in nature. *Neville,* 459 U.S. at 564, 103 S.Ct. at 923, 74 L.Ed.2d at 759; *Hoenscheid,* 374 N.W.2d at 130.

[¶ 39.] Defendant cites *Elson v. State,* 659 P.2d 1195, 1198 (Alaska 1983), for the proposition that a refusal to consent to a *search* should not be admitted at trial, as "a person who is asked to consent to a search would not know whether he is protecting or prejudicing himself by choosing not to consent." However, in that case the defendant refused to consent to a "pat down," a physical search of his body, after being arrested. *Id.* at 1196. The defendant in that case was under the mistaken belief that he had a Fourth Amendment right to refuse the physical search. The Alaska Supreme Court's rationale for overturning the admission of the refusal was that it would chill others from exercising the right to refuse consent to future searches in violation of Fourth Amendment rights. *Id.* at 1199. However, in a case more fact specific to the instant case, the Alaska Court of Appeals held that there is no Fifth Amendment right to re-

fuse to perform non-testimonial field sobriety tests, and that the government is not precluded from offering evidence of a defendant's refusal to take such non-testimonial tests. *McCormick v. Municipality of Anchorage,* 999 P.2d 155, 159 (Alaska Ct. App.2000).

[¶ 40.] Defendant also cites several cases to support his proposition that a refusal to take a non-testimonial physical evidence test is not admissible at trial, including *People v. Brooks,* 334 Ill.App.3d 722, 268 Ill.Dec. 350, 778 N.E.2d 336 (2002); *People v. Eickhoff,* 129 Ill.App.3d 99, 84 Ill.Dec. 300, 471 N.E.2d 1066 (1984); and *State v. Driver,* 38 N.J. 255, 183 A.2d 655 (1962). However, each of these cases is distinguishable from the instant case, as those cases dealt with testing mechanisms that are unreliable and therefore not admissible even if a defendant consents to the particular test. *Brooks,* 778 N.E.2d at 341 (noting that the results of a portable breath test are inadmissible in Illinois as evidence of intoxication); *Eickhoff,* 84 Ill. Dec. 300, 471 N.E.2d at 1068 (noting that the results of a polygraph test are inadmissible at trial and therefore the refusal to take the polygraph test is also inadmissible); *Driver,* 183 A.2d at 658 (holding results of a polygraph test are inadmissible at trial, as is the refusal to take the test).

[¶ 41.] Defendant next argues that SDCL 32–23–10.1 [4] makes the refusal to submit to chemical analysis of blood, urine, breath, or other bodily substance admissible into evidence at trial, but only with reference to driving under the influence statutes. Defendant argues this narrowly

---

4. SDCL 32–23–10.1 provides:
 If a person refuses to submit to chemical analysis of the person's blood, urine, breath, or other bodily substance, or allow the withdrawal of blood or other bodily

substance for chemical analysis as provided in § 32–23–10, and that person subsequently stands trial for violation of § 32–23–1 or § 32–23–21, such refusal may be admissible into evidence at the trial.

drawn statute should not be extended to automobile passengers who refuse to submit to a urinalysis after an arrest for possession of a controlled substance.

[¶42.] SDCL 32–23–10 provides that any person operating a vehicle in South Dakota is deemed to have consented to a chemical test of the alcoholic content of his blood if arrested for driving under the influence. The statutory scheme also provides that the refusal to submit to such a test is admissible at trial for driving under the influence. SDCL 32–23–10.1 and SDCL 19–13–28.1.[5]

[¶43.] In *Neville,* the United States Supreme Court held that the refusal to take a blood-alcohol test that is safe, painless, and commonplace, after a police officer has lawfully requested it, is not an act coerced by the officer and is therefore not protected by the Fifth Amendment privilege against self-incrimination. 459 U.S. at 564, 103 S.Ct. at 923, 74 L.Ed.2d at 759. The Supreme Court, however, did not narrowly limit its holding to DUI implied consent laws. If the state may legitimately compel the defendant, against his will, to accede to a physical test, then "the State action becomes no *less* legitimate when the State offers a second option of refusing the test, with the attendant penalties for making that choice." *Neville,* 459 U.S. at 563, 103 S.Ct. at 922, 74 L.Ed.2d at 759.

[¶44.] We have previously adopted the *Schmerber* analysis in the context of alcohol-related offenses. *See State v. Nguyen,* 1997 SD 47, 10, 563 N.W.2d 120, 122–23; *State v. Tucker,* 533 N.W.2d 152, 154–55 (S.D.1995); *State v. Sickler,* 488 N.W.2d

70, 73 (S.D.1992); *State v. Lanier,* 452 N.W.2d 144, 145–47 (S.D.1990); *State v. Heinrich,* 449 N.W.2d 25, 26–27 (S.D. 1989); *State v. Parker,* 444 N.W.2d 42, 43–44 (S.D.1989); *State v. Ager,* 416 N.W.2d 871, 874 (S.D.1987); *State v. Hartman,* 256 N.W.2d 131, 134 (S.D.1977). We have also adopted the *Schmerber* analysis for the offense of possession of marijuana under SDCL 22–42–6. *Hanson,* 1999 SD 9, ¶36, 588 N.W.2d at 893. We have stated:

> Bodily substance samples are not subject to the exclusionary rule under the Fourth Amendment if they are taken (1) incident to a lawful arrest, (2) by a reliable and accepted method of obtaining such sample, (3) in a reasonable, medically approved manner, and (4) where there is probable cause to believe that the evidence sought exists. It is also held that the elimination of alcohol by natural bodily functions presents exigent circumstances which obviate the necessity of obtaining a search warrant.

*Id.* 28, 588 N.W.2d at 891 (quoting *Tucker,* 533 N.W.2d at 154 (alterations in original) (citing *Hartman,* 256 N.W.2d at 134 (citation omitted))).

[¶45.] Therefore, in drug offense cases, just as in alcohol-related offenses, the refusal by a defendant of an officer's legitimate request to take a urinalysis is not protected by the Fifth Amendment right against self-incrimination, and such a refusal by a defendant is admissible at trial. This is so even if the defendant is not warned that his refusal will be admissible at trial. *See Neville,* 459 U.S. at 565–66, 103 S.Ct. at 923–4, 74 L.Ed2d at 760.

---

5. SDCL 19–13–28.1 provides:
 Notwithstanding the provisions of § 19–13–28, when a person stands trial for driving while under the influence of alcohol or drugs, as provided under § 32–23–1, and that person has refused chemical analysis, as provided in § 32–23–10, such refusal is admissible into evidence. Such person may not claim privilege against self-incrimination with regard to admission of refusal to submit to chemical analysis.

[¶ 46.] In the instant case, Defendant was asked to submit to a urinalysis after being arrested for possession of a controlled substance. The arrest was based on probable cause to believe Defendant had committed the offense based on the evidence obtained from the search of the vehicle, and the visible track marks on Defendant's arms.[6] The Defendant had no Fifth Amendment right to refuse the non-testimonial testing procedure. Defendant's refusal to submit to the testing procedure is equally non-testimonial in nature and its admission at trial does not offend the Fifth Amendment. The trial court did not err when it allowed the State to admit Defendant's refusal to submit to law enforcement's legitimate request for the urine sample.

## B) Objectionable Jury Instruction

[¶ 47.] At trial, the State offered a jury instruction modeled after the pattern jury instruction for a Driving While Intoxicated suspect who refuses to supply a blood sample for chemical analysis:

> Evidence has been submitted that the defendant refused to submit to a test of his urine to determine the existence of any controlled drug or substance in his urine. The refusal to submit is not sufficient, by itself, to establish guilt of the defendant. It is a fact which if proved, may be considered by you in light of all other proved facts in deciding whether the defendant is guilty or not guilty of the crime of Possession of a Controlled Substance. The weight, if any, to which the refusal is entitled and whether the conduct shows a consciousness of guilty are matters for your determination.

Defendant objected to the instruction, and was overruled.

[¶ 48.] Defendant argues on appeal that the instruction on his refusal to submit to the urinalysis was objectionable because there is no affirmative duty to provide a urine sample at the request of a police officer. The jury instruction used at trial in the instant case was patterned after the jury instruction used in driving under the influence cases when a defendant refuses to submit to a blood-alcohol test. *See* South Dakota Pattern Jury Instruction § 3–10–7. However, Defendant failed to cite any authority to support his contention that the jury instruction was impermissible due to the lack of an affirmative duty to provide a urine sample.

[¶ 49.] "The failure to cite supporting authority is a violation of SDCL 15–26A–60(6) and the issue is thereby deemed waived." *State v. Pellegrino*, 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599 (citing *State v. Knoche*, 515 N.W.2d 834, 840 (S.D.1994); *State v. Dixon*, 419 N.W.2d 699, 701 (S.D. 1988)). Despite the failure to cite authority directly related to the objectionable nature of the jury instruction, we will address the instruction to access whether it was proper.

[¶ 50.] We review jury instructions as a whole to learn if they provided a full and correct statement of the law. *Sommervold v. Grevlos*, 518 N.W.2d 733, 739 (S.D.1994) (citing *Cody v. Edward D. Jones & Co.*, 502 N.W.2d 558, 563 (S.D. 1993); *State v. Martin*, 449 N.W.2d 29, 33 (S.D.1989)). Jury instructions that are misleading, conflicting, or confusing create reversible error. *State v. Moran*, 2003 SD 14, ¶ 15, 657 N.W.2d 319, 324 (citing *Schaffer v. Edward D. Jones & Co.*, 1996 SD 94, ¶ 19, 552 N.W.2d 801, 808; *Wallahan v. Black Hills Elec. Co-op., Inc.*, 523 N.W.2d 417, 423 (S.D.1994)). The party seeking to set aside a verdict because of erroneous

---

**6.** Defendant does not contest the validity of the arrest.

jury instructions must also establish that the erroneous instructions were prejudicial. *Id.* (citing *Davis v. Knippling*, 1998 SD 31, ¶ 4, 576 N.W.2d 525, 526–27) (additional citations omitted). "An erroneous instruction is prejudicial if in all probability it produced some effect upon the verdict and is harmful to the substantial rights of the party assigning it." *First Premier Bank v. Kolcraft Enterprises, Inc.*, 2004 SD 92, ¶ 40, 686 N.W.2d 430, 448 (citing *Carpenter v. City of Belle Fourche*, 2000 SD 55, 609 N.W.2d 751).

 [¶ 51.] Whether submitting the instruction to the jury is prejudicial is considered "from the standpoint of what the trial judge knew from the evidence at the time he gave this instruction." *State v. Aesoph*, 2002 SD 71, ¶ 47, 647 N.W.2d 743, 759 (citing *Artz v. Meyers*, 1999 SD 156, ¶ 8, 603 N.W.2d 532, 534) (quoting *Del Vecchio v. Lund*, 293 N.W.2d 474, 476 (S.D.1980)). If an issue before the court is supported by competent evidence in the record, the trial court should instruct the jury. *Id.*

 [¶ 52.] We have previously held that an inference of knowing possession may be established at trial by circumstantial evidence. *Hanson*, 1999 SD 9, ¶ 43, 588 N.W.2d at 894 (citing *State v. Dickson*, 329 N.W.2d 630, 632 (S.D.1983) (citing *State v. Winckler*, 260 N.W.2d 356, 366 (S.D.1977))). Circumstantial evidence is defined as evidence that is a product of inference. *Fajardo v. Cammack*, 322 N.W.2d 873, 876 (S.D.1982). Circumstantial evidence is "evidence of facts or circumstances from which the existence or non-existence of the fact in issue may be inferred." *Id.* (quoting Black's Law Dictionary 221 (rev. 5th Ed.1979)).

[¶ 53.] In the context of the instant case, the question becomes whether Defendant's refusal to submit to the urinalysis could be used to infer whether Defendant was in knowing possession of methamphetamine on the date in question. Therefore the threshold question becomes: what constitutes possession?

 [¶ 54.]We have previously defined knowing possession "as having control over a place or thing with knowledge of and the intent to have such control. The possession does not have to be actual, physical possession on one's person." *Dickson*, 329 N.W.2d at 632 (holding possession in a grand theft charge could be established through circumstantial evidence proven beyond a reasonable doubt) (citing *State v. Alexander*, 286 N.W.2d 520, 523 (S.D.1979)). Additionally, possession need not be exclusive, but may be shared with others. *Id.* (citing *Wellner*, 318 N.W.2d at 331; *State v. Larkin*, 87 S.D. 61, 67, 202 N.W.2d 862, 866 (1972)). More importantly, in the context of a charge of knowing possession of a controlled substance, a positive urinalysis that reveals the presence of a controlled substance in a defendants urine is sufficient in and of itself to support a conviction due to the language of SDCL 22–42–1(1). *State v. Schroeder*, 2004 SD 21, ¶ 14, 674 N.W.2d 827, 831.[7]

[¶ 55.]Defendant does cite one case in support of his contention that the admission of his refusal to take the urinalysis was more prejudicial than probative, *People v. Eghan*, 344 Ill.App.3d 301, 279 Ill. Dec. 223, 799 N.E.2d 1026 (2003). However, Illinois statutes do not define possession to include absorption of a controlled

---

7. SDCL 22–42–1(1) provides in relevant part: " 'Controlled drug or substance,' a drug or substance, or an immediate precursor of a drug or substance, listed in Schedules I through IV. The term includes an altered state of a drug or substance listed in Schedules I through IV absorbed into the human body[.]"

substance into the body as does the South Dakota statutory scheme. *See Eghan*, 279 Ill.Dec. 223, 799 N.E.2d at 1035 (citing 720 IllCompStat 570/402(c)). The Illinois Appellate Court held the refusal to submit to the test was not probative of the possession charge, as the refusal could only establish that the defendant had recently consumed cocaine. *Id.* Because ingestion was not an element of the offense of possession of a controlled substance under the Illinois statute, the evidence of defendant's refusal was held to be more prejudicial than probative. *Id.* at 1035–36.

 [¶ 56.] In the instant case, consumption or ingestion of methamphetamine was clearly relevant to establish knowing possession of the controlled substance under a theory that Defendant had ingested some of the methamphetamine purchased by the occupants of the vehicle. Methamphetamine was found in the vehicle within Defendants immediate vicinity, as were syringes, and a scale with methamphetamine residue on it. Testimony at trial indicated that a minimum of one-half gram of methamphetamine was in the possession of the occupants of the vehicle that day. Even more damaging to Defendant's case were the fresh tracks marks on his arm identified by the two state troopers at the scene of the traffic stop. Defendant's refusal to take the urinalysis could therefore be used to infer whether he had ingested methamphetamine and was in knowing possession of methamphetamine within the meaning of SDCL 22–42–1(1) at the time he was arrested.

[¶ 57.] The jury instruction provided a full and correct statement of the law, in that the State was required to prove that Defendant was in knowing possession of methamphetamine. Knowing possession could be shown by knowing physical possession or control over the drugs, or knowing ingestion of the drugs. Evidence of Defendant's refusal to provide a urine sample was sufficient to support an inference of knowing possession through ingestion. Defendant has failed to show that the instruction given was in error.

[¶ 58.] Affirmed.

[¶ 59.] SABERS, KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.